539 F.2d 996
 Fed. Sec. L. Rep. P 95,538
Irving M. MOLEVER et al., Appellees,
v.
Robert LEVENSON et al., Appellants,
and
The Bank of Wheeling, a West Virginia Corporation, Defendant.
Irving M. MOLEVER et al., Appellants,
v.
Robert LEVENSON et al., Appellees.
 Nos. 75-1107, 75-1108.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 7, 1975.
Decided May 3, 1976.
 
 Stanley F. Preiser, Charleston, W. Va. (W. Stuart Calwell, Jr., Preiser & Wilson, Charleston, W. Va., on brief), for appellants in No. 75-1108 and for appellees in No. 75-1107.
 Harold Ungar, Washington, D. C. (Francis X. Grossi, Jr., Williams, Connolly & Califano, Washington, D. C., on brief), for appellants in No. 75-1107 and appellees in No. 75-1108.
 Before BRYAN, Senior Circuit Judge, and BUTZNER and RUSSELL, Circuit Judges.
 ALBERT V. BRYAN, Senior Circuit Judge:
 
 
 1
 These are appeals in three actions consolidated for trial, arising during 1963-1968 in the internal economy of the Bank of Wheeling, West Virginia. They embrace claims for damages flowing from these transactions:
 
 
 2
 (1) In one action, designated herein as the Rule 10b-5 case, the sale, upon default in payment of the note, of a block of shares of the Bank's stock pledged by one stockholder as collateral for a loan from a separate bank, and the purchase thereof by another stockholder of the Bank of Wheeling, were alleged to violate Section 10(b) of the Securities Exchange Act of 1934, and Securities and Exchange Commission (SEC) Rule 10b-5.[1]
 
 
 3
 (2) In another action, now known as the derivative suit, shareholders allegedly in the interest of the Bank asserted the following claims against two other stockholders: (a) one for losses of the Bank in a practice, known as the "floor plan", between the Bank on the one hand, and on the other, these two stockholders and their solely-owned Reichart Furniture Company; and (b) the other for Bank losses on certain loans averred to have been indirectly authorized by the two stockholders and unwarrantably granted to the customers of Paul Dennis, a used car dealer, and here called the Dennis losses.
 
 
 4
 (3) In still another action, presently denominated the defamation claim, two shareholders allegedly slandered and libeled a third shareholder during directors' and stockholders' meetings.[2]
 
 
 5
 In the first two actions, judgments for damages went for the claimants while in the last a defendant's judgment n. o. v. was granted. In appeal No. 1107 the defendants in the first two actions are the appellants; in No. 1108 the appellant is the plaintiff in the third claim.
 
 
 6
 Following now is a factual orientation of the litigated issues and the respective places of the parties therein. The Bank of Wheeling was chartered at the instance of the major stockholder, Irving Molever, the owner of several retail stores in and around Wheeling. It began business in April 1965 with Molever as its president and chief executive officer. The next largest shareholders were Robert and Donald Levenson, owners and managers of the Reichart Furniture Company, a retail appliance enterprise in Wheeling.
 
 
 7
 During its initial year, the Bank suffered the Dennis losses through a series of soured automobile loans. They had been made by the Bank's vice president, Jay Noel. The Levensons, with other directors, laid the blame for these defaults on Molever for his neglect in supervising Noel. In turn, Molever attributed the bad notes to the Levensons, averring that they had been more responsible than he for the surveillance of Noel. Shortly thereafter, in August 1966, Molever resigned as president.
 
 
 8
 Failure of the Bank could be prevented, it was anticipated, only through expansion of its capital. A plan therefor was formulated in which existing stockholders could subscribe for additional stock. Pursuant to this proposal, the Levensons subscribed for more shares and the Bank was thereby saved, but by the time of the trial the Levenson family had become the majority stockholders. Neither of the Levensons was an officer of the Bank but both were on its board of directors and members of its examining, loan and executive committees.
 
 I.
 
 9
 The first cause of action[3] rested upon SEC Rule 10b-5. On August 17, 1966 Molever pledged 2,050 of the Bank's shares with the Irving Trust Company of New York to secure the payment of a three-months' loan to him of $78,750.00. By the terms of the note, in the event of default the pledgee was authorized to liquidate the collateral at public or private sale without notice to the maker of the note. In January 1968, more than 14 months after the maturity of the note, Robert Levenson purchased the obligation from the Trust Company for $59,450.00. He then notified Molever of his intention to sell the collateral at private sale, but Molever made no response. Thereupon the 2,050 shares were sold, January 11, 1968, to the wife of Robert Levenson for $29.00 per share, an aggregate sum of $59,450.00.
 
 
 10
 In the latter part of 1967, and thus prior to the sale, the Bank had recovered $170,000.00 from the surety on the fidelity bond of Noel because of his mishandling of the Dennis loans. On January 6, 1968 Molever, with all other stockholders, had been sent a copy of the financial statement of the Bank's condition as of the end of 1967. It reflected an increase in the Bank's cash account by $170,000.00.
 
 
 11
 Alleging that he was entitled under section 10(b) of the Securities Exchange Act of 1934 and the SEC Rule 10b-5, supra, to disclosure of the bond recovery before Levenson sold the shares, on December 31, 1969 Molever and his co-owners of the stock sued Levenson for damages.[4] The complaint alleged that Molever would not have allowed the stock to be sold if he had known of this $170,000.00 augmentation of the Bank's assets. The jury awarded Molever $59,496.00 as compensation for the loss which he contended was occasioned him by the sale.
 
 
 12
 Levenson appeals. No breach of the Act by this appellant is perceived. There was no "device, scheme or artifice to defraud . . . in connection with the purchase or sale of (the stock)." Although not demandable, Molever had been given due notice of the intended sale. Moreover, he had been sent a financial statement of the Bank showing the addition to the Bank's assets. In law on these facts he had no ground of complaint. Therefore, the verdict and the judgment in this action must be reversed and vacated.
 
 II(a)
 
 13
 The plaintiffs in the derivative action were the Modern Marts, Inc., entirely owned by Molever, three of his relatives, and a friend. All were stockholders in the Bank and in reality represented Molever. Filed on January 9, 1968, the suit purported to be brought on behalf of all similarly situated shareholders for the use and benefit of the Bank. The first of its causes of action charged that Bank directors Robert and Donald Levenson and their company, Reichart Furniture Company, caused the Bank losses through a fraudulent appearance of what is known as a "floor plan".
 
 
 14
 A genuine floor plan is pursued when a wholesale supplier wishes to persuade a retailer of appliances, such as Reichart, to maintain a full store of the wholesaler's merchandise. The motivation to the retailer is the supplier's allowance to it of a discount equivalent to its bank charges for financing the purchases. To set the plan in operation, the retailer arranges with the bank for it to pay the supplier's bills for the goods and reserve liens on them until sold. From the sale proceeds the retailer satisfies the amounts owing the bank as reimbursement of the sums it advanced to the supplier.
 
 
 15
 The device actually adopted by the Levensons and Reichart and the subject of the derivative suit was, as their counsel here frankly concedes, a "deceit" of which "no defense" is made. Condensed, it was this: Reichart was quite able to buy its inventory without the aid of bank financing. Nevertheless, the company desired to obtain the discount the supplier offered. To this end, the Levensons, while directors of the Bank of Wheeling, contrived with it to mislead the supplier with a false floor plan. Upon receipt of the supplier's discounted invoice, Reichart would hand its check to the Bank for the amount of the invoice, and the Bank by its own check would then remit the money to the supplier. Letters purportedly from the Bank to the supplier were written by the Levensons on Bank stationery loaned to them by the Bank. The cost of actually issuing the checks was paid by Reichart. As there was no extension of credit by the Bank, no interest was charged. The Levensons contended that Molever had consented to allow them this use of the Bank, but Molever denied any knowledge of these machinations.
 
 
 16
 The derivative suitors charged that the Levensons had violated their duties as directors; that the Bank had been injured by this misconduct of the Levensons and Reichart; and that the directors of the Bank, despite the plaintiffs' demands, had declined to bring suit against the offenders; and they named the Bank as a party defendant along with the Levensons, adding the allegations requisite under F.R.Civ.P. 23.1 for a derivative complaint. Verdict went against the defendants for $23,520.00 compensatory, and $1,000,000.00 punitive, damages.
 
 
 17
 Despite the inexcusable deception by the defendants, subsequent arrangements for release and indemnification negate plaintiffs' right of recovery. These were embodied in an agreement entered into on May 20, 1967 by the Bank of Wheeling, Reichart Furniture Company, Donald W. Levenson and Robert L. Levenson. It undertook to satisfy or resolve the possible liabilities of each party to the floor plan operation.
 
 
 18
 Included among these was an apprehension that the Bank might suffer a loss through responsibility to the suppliers for the discount taken by the Levensons and Reichart instead of being paid to the Bank. Although seemingly only a supplier could reclaim it, The Federal Deposit Insurance Corporation, upon its canvass of these transactions, found the suppliers disinclined to press such claims that this course of dealing was a general practice among suppliers. Nevertheless, the FDIC did espy a remote liability upon the Bank to the suppliers in the sum of $14,270.05. Thereupon there was written into the agreement a promise that the defendants would, and in fact they did, place this amount in a savings account with the Bank of Wheeling by way of indemnity to it in the event this contingency became an actuality. Reichart and the two Levensons agreed additionally to indemnify and save the Bank harmless of "any and all claims, demands, damages and liability whatsoever" then existing or thereafter asserted by the suppliers.
 
 
 19
 Next, the agreement contained a release of Reichart and the Levensons individually and as directors of the Bank of "any and all claims, demands, damages, actions and any and all liability" to the Bank because of anything done or omitted to be done by any of the defendants relating to the floor planning.
 
 
 20
 But in the suit the plaintiffs challenge the validity of this agreement, charging that it did not rest upon an adequate consideration, that it was unfair as a restoration of the Bank's loss and that it was accomplished through undue influence of the Levensons, i. e., after Molever had resigned as president and while the Levensons were in overbearing control of the board of directors and the Bank. These questions, particularly of the presence or absence of fraud in the conclusion of the agreement, were submitted to the jury.
 
 
 21
 On the basis of the West Virginia statute, Code of West Virginia, former section 31-1-69,[5] the Court instructed the jury, in substance, that for the agreement to stand, the defendants had to establish that the settlement and release "were bona fide and free of fraud on the part of the directors and made in the best interests of the Bank of Wheeling and its stockholders". The jury seemingly found against the agreement's validity.
 
 
 22
 Assuming that the West Virginia statute required the defendants to substantiate the justice and bona fides of the agreement, to us they did so by clear and convincing evidence. It is overwhelming in their favor on the issue.
 
 
 23
 To begin with, as previously noted, the agreement was the suggestion of The Federal Deposit Insurance Corporation and not of the defendants' initiation. Although a concerned agency, it could perceive no liability on the Bank for the misuse of the floor plan and asked for the indemnity simply through an abundance of caution. Protection of the Bank was the consideration to the Bank; their release was the consideration to the defendants. Thus on its face it was a complete, solid pact. Nor was it an unjust contract for the Bank; it occasioned no loss. Even if the plaintiffs were asserting a loss from that part of the Bank's business taken over by the defendants, the evidence does not purport to establish the amount of the net loss. The verdict of $23,520.10, it may be presumed, was the FDIC's estimate of the Bank's contingent liability to the suppliers, that is $14,270.05, plus interest upon it.
 
 
 24
 There was no sign of coercion by the defendants. Indeed, before the agreement was executed by the Bank, the directors had procured the opinion of reputable independent counsel on its efficacy in law. He assured them of the defensive coverage of the agreement to the Bank. Additionally, disclosing the absence of hurry or pressure, it was not signed by the Bank until some three months after the directors had approved it.
 
 
 25
 Contrary to the plaintiffs' charges, the defendants were not majority stockholders or officers or otherwise in control of the Bank during the preliminary or final stages of the agreement; they were not in that position until the time of the trial, years afterwards. Of the 15 directors, 13 were present at the February 23, 1967 meeting, when the agreement was first approved. The two Levensons withdrew from the meeting during the discussions of the proposal, returning thereafter albeit before the voting but did not vote. The plaintiffs have unreservedly accepted the contract's advantages to the Bank and its benefits to their shareholdings. On this incontrovertible evidence we uphold the agreement. In short, plaintiffs' proof just did not pass the test exacted by the State's jurisprudence:
 
 
 26
 "Under the law of West Virginia, the evidence to overcome the clear and explicit terms of an express release must be strong and convincing." Chesapeake & O. Ry. Co. v. Chaffin, 184 F.2d 948, 952 (4 Cir. 1950).
 
 
 27
 There are numerous errors assigned by the defendants to the conduct of the trial, including the lack of plaintiffs' standing under F.R.Civ.P. 23.1 to maintain the action and improper remarks by the plaintiffs' counsel in the presence of the jury. In view of the grounds of our decision, there is no need further to ponder these points. Upon defendants' motions, the District Court's final order on this cause of action must be reversed, with judgment for the defendants.
 
 II(b)
 
 28
 In the second claim of the derivative suit the plaintiffs charged that approximately 480 loans were made to the automobile dealer previously mentioned, totalling $891,583.77 as of April 25, 1966. Continuing, the complaint is that, as of July 1966, from the write-off of these loans the Bank lost more than $478,945.00, the whole of which was imputable to the fault of the defendants Robert and Donald Levenson. During this period Robert was a member and chairman of the Executive Loan Committee as well as a director of the Bank; Donald was also a director, as well as a member of that Committee and chairman of the Examining Committee. Plaintiffs aver, particularly, that both Robert and Donald while serving in their several capacities in the Bank were guilty of malfeasance and nonfeasance, amounting to breaches of their respective responsibilities to the Bank. As a consequence, it is said they caused the Bank to allow excessive credit and loans to the automobile dealer and his customers resulting in the losses of $478,945.00.
 
 
 29
 Especially it is asserted that notwithstanding defendants' duties as chairman and members of the Examining Committee, they neglected to conduct timely audits of the books and records of the Bank, and thus were derelict by permitting the Bank to grant these credits, the more so since they were in sums beyond the limit fixed by law for the Bank. These derelictions were knowingly committed, it is further pleaded, with malice and wanton disregard of defendants' duties.
 
 
 30
 Answering, the defendants Levenson deny their culpability and deny, too, every aspect of delinquency and disregard of obligations ascribed to them by the plaintiffs. Additionally, they rejoin that the Dennis loans were made with the consent, approval and knowledge of Molever, who at the time was president and chief executive officer of the Bank. Each side offered evidence supportive of its contentions. The jury's verdict was $600,000.00 in compensatory, and $100,000.00 in punitive, damages.
 
 
 31
 Ordinarily, in this state of the record, the verdict might be looked to as a final resolution of the conflict in the evidence dictating affirmance. However, there were rulings by the trial court prejudicial to the defendants, amounting to error, and requiring the vacation of the verdict and the grant of a new trial.
 
 
 32
 Initially, error occurred in the consolidation and joint trial of the three cases embracing four separately stated causes of action. This procedure did not comport with the aim of Rule 42(a), F.R.Civ.P., permitting a simultaneous hearing of "actions involving a common question of law or fact". As an example, the 10b-5 claim tendered no question of law or fact like those in the derivative and defamation suits.
 
 
 33
 The effect of the ill-advised consolidation was severely harmful and so serious as to require vacation of the verdicts and reversal of the judgments in this segment of the litigation. Even as ultimately restricted, the proceedings lasted 15 days and absorbed over 4,500 transcribed pages of testimony. In light of such a plenitude of evidence, the jurors would have had to be of uncommonly retentive minds to allocate the proof among the four separate claims.
 
 
 34
 Again, a curtailment of the available trial days was seriously injurious to the defendants. On Thursday, April 18, 1974, after six days of hearing, the Court declared that the trial would have to be concluded on May 3 since another case was scheduled for hearing immediately thereafter. It also advised counsel that resumption of the case on the next day, Friday, April 19, was not allowable because an injunction application in another matter was fixed for presentation that day and F.R.Civ.P. 65 accorded it precedence. Nevertheless the trial was not taken up promptly after the injunction matter was completed. The Court stated a recess over the following Monday, April 22, was obligatory to give the court reporter a day off since he would be engaged in a judicial conference during the weekend.
 
 
 35
 After directing these delays the Court explained that it would divide the remaining time equally between the litigants. This computation debited each side with the periods it had consumed in questions on direct and cross-examination. By April 25, after nine trial days, the Court calculated that under this division of time the plaintiffs must rest on April 29, the defendants to have three days April 30 through May 2 to introduce their proof.
 
 
 36
 Molever was then called to the stand by the plaintiffs. His evidence occupied almost two entire days and he was immediately followed by another witness. Plaintiffs rested on the afternoon of May 1.
 
 
 37
 This termination left to the defendants only an opportunity of something more than a day for completion of their case. At the expiration of this allotment, defendants protested and moved for a mistrial for denial of due process, making known the additional testimony intended to be adduced. Importantly, this included the proof to be put on through the defendants Levenson in defense of all three cases.
 
 
 38
 The protest failed. The Court justified its ruling on the ground that the defendants had chosen to use most of their time making their defense through cross-examination, and thus left only a scant opening for the remainder of their proof. We believe that the time-scheduling of a trial is within the discretion of the court, but that here this discretion was unreasonably exercised.
 
 
 39
 Without reaching the due process argument, we hold these recesses were in their effect too restrictive and were reversible errors. See, generally, Annotation, 5 A.L.R.3d 169, et seq. Moreover, the judgment was entered in favor of "the plaintiffs, and all other stockholders of the Bank of Wheeling similarly situated." We previously held in earlier proceedings that the real party in interest in this derivative action is the Bank. Bernstein v. Levenson, 437 F.2d 756 (4 Cir. 1971). The award of damages to the stockholders, instead of the Bank, was therefore erroneous.
 
 
 40
 The judgment on this part of the derivative suit the Dennis losses must be vacated and a new trial ordered thereon.
 
 III.
 
 41
 In a third action the defamation suit on September 22, 1967 Molever complained in three counts against Robert Levenson and Donald Levenson, together with Joseph Gompers, their attorney, and Abraham Pinsky, attorney for the Bank of Wheeling, for slander and libel. The statements attributed to the defendants allegedly were made, both verbally and in writing, with malice and ill-will and with intent to injure Molever in his public standing and reputation, as well as in his position as president and member of the board of directors of the Bank of Wheeling. The first count names Robert Levenson as the sole defendant. This defamation is charged as occurring on September 29, 1966 at a meeting of the board of directors of the Bank. Compensatory damages of $150,000.00 and punitive damages of $50,000.00 were demanded.
 
 
 42
 In the second count, the defendants were Robert Levenson, Donald Levenson and Joseph Gompers. Here the allegations are that at a meeting of the directors in February, 1967 the three defendants falsely and maliciously stated that Molever had been "grossly incompetent in his position as president of the Bank, was a party to an illegal and unlawful transaction and guilty of breaching his fiduciary capacity as an officer and director of the Bank". It is said that these defendants knew their words to be untrue and that Molever was thereby deprived of public confidence. Compensatory damages of $150,000.00 and punitive damages of $50,000.00 were sought.
 
 
 43
 In the third count, Abraham Pinsky was the lone defendant. He was charged with maliciously and falsely speaking of Molever at a meeting of the board of directors on November 25, 1966, to the effect that Molever has "wrecked this Bank and is responsible for its present financial crisis". Relief was asked against Pinsky in $250,000.00 as compensatory, and $50,000.00 as punitive, damages.
 
 
 44
 The principal defense in each instance was that there was no liability because the asserted utterances and writings were qualifiedly or conditionally privileged. They were proper comments, it is said, made without malice or ill-will, upon matters in which, the District Court recognized, all parties to the communication were immediately concerned as directors or stockholders of the Bank or their counsel. Defendant Gompers, as noted earlier, represented the Levensons, and defendant Pinsky the Bank, in respect to the past conduct of Molever with the Bank.
 
 
 45
 No verdict was rendered against Gompers or Pinsky, but the jury allowed substantial sums to the plaintiff against the Levensons on both counts. These verdicts were set aside and judgment n. o. v. entered for the defendants. Molever appeals.
 
 
 46
 West Virginia law applies in this diversity action. Assuming the words were spoken when and where the plaintiff now charges, then whether the occasion gave rise to a qualified privilege is a question of law for the court, Montgomery Ward v. Watson, 55 F.2d 184, 187 (4 Cir. 1932). Another question for the court is "whether the publication exceeded that which the occasion justified," Montgomery Ward, supra. It is sometimes phrased as whether the defendant "exceed(ed) the privilege, either by vehemence of the published words or extravagant statement," Swearingen v. Parkersburg Sentinel Co., 125 W.Va. 731, 26 S.E.2d 209, 216 (1943). Finally, the burden is upon the plaintiff to prove to the jury that the privileged statement was motivated by express malice or ill-will, Montgomery Ward, supra, 55 F.2d at 186-87, also referred to as "the spirit of mischief, or of criminal indifference," Swearingen, supra. See also Guthrie v. Great American Ins. Co., 151 F.2d 738, 740 (4 Cir. 1945), arising, like Montgomery Ward, in West Virginia; Ward v. Ward, 47 W.Va. 766, 35 S.E. 873 (1900).
 
 
 47
 Applying these principles the District Judge quite rightly concluded that the occasion was protected and the statements were within the limits warranted by the circumstances. Furthermore, his ruling that the evidence was insufficient to allow the jury to find malice or ill-will was a correct legal conclusion. The vacation of the verdicts and the dismissal order were proper.
 
 
 48
 In summary, the judgment of the District Court in the defamation suit will be affirmed; the judgment on the second claim the Dennis line loans in the derivative suit will be reversed and the claim remanded for a new trial; and the judgments on the remaining claims will be reversed with final judgments for the defendants therein.
 
 
 49
 Affirmed in part; Reversed in part; and Remanded in part.
 
 
 
 [1]
 The Act and Rule 10b-5 in their pertinent parts read as follows:
 Section 10(b) of the Act, 15 U.S.C. § 78j(b):
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."
 Rule 10b-5, 17 CFR 240.10b-5:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) to employ any device, scheme, or artifice to defraud,
 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security."
 
 
 [2]
 Jurisdiction of both the derivative suit and the defamation claim was premised on diversity of citizenship; jurisdiction of the Rule 10b-5 case was pleaded on the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and, perhaps with an abundance of caution, as a Federal question involving more than $10,000 under 28 U.S.C. § 1331(a). These allegations were proved without contest
 
 
 [3]
 Discussion of the several actions will follow the order in which they are presented by the appellants in No. 75-1107 because that appeal covers two of the three major issues in this copious record
 
 
 [4]
 This action was commenced in Federal District Court for Arizona but was transferred to the District of West Virginia for trial
 
 
 [5]
 "No member of the Board of Directors shall vote on a question in which he is interested otherwise than as a stockholder, except the election of a president or other officer or employee, or be present at the Board while the same is being considered;"