Richard W. BOSSE et al.,
Plaintiffs-Appellants,

v.

CROWELL COLLIER AND MACMILLAN
et al., Defendants-Appellees.

No. 75-1298.

United States Court of Appeals,
Ninth Circuit.

Dec. 6, 1977.

Thomas J. Trimble (argued), of Jennings, Strouss & Salmon, Phoenix, Ariz., for plaintiffs-appellants.

Terence F. Gilheany (argued), of Cadwalder, Wickersham & Taft, New York, N. Y., for defendants-appellees.

Before CHAMBERS and GOODWIN, Circuit Judges, and CONTI,* District Judge.

* The Honorable Samuel Conti, United States District Judge, Northern District of California, sitting by designation.

CHAMBERS, Circuit Judge:

This is a certified interlocutory appeal under Fed.R.Civ.P. 54(b) from the district court's order dismissing seven of plaintiffs' nine claims for relief alleged in their complaint. Accepting as true the allegations in the complaint, as we must, the relevant facts of record are as follows.

Plaintiffs are former officers, directors and controlling shareholders of Coinart Corporation [Coinart], a manufacturer of musical instruments, mainly saxophones. C. G. Conn, Ltd. [Conn], a manufacturer and retailer of musical instruments, was acquired in 1969 by defendant Crowell Collier and Macmillan [Macmillan], a large diversified conglomerate. Through various contractual dealings, which are outlined below, Conn and its parent Macmillan became the primary suppliers, customers and creditors of Coinart. In late 1970, a written contract [Supply-Purchase Contract] was executed by Coinart and Conn, whereunder Coinart agreed to sell and Conn to buy certain saxophone instruments pursuant to specific orders. Payment by Conn to Coinart was to be made within ten days of shipment. The contract also required Conn to furnish specified tooling and a current work-in-progress inventory of "good and usable" saxophone parts, apparently to be used for the production of the instruments by Coinart. Under this contract, Conn became Coinart's largest purchaser and supplier. When Coinart began negotiations with other entities for the possible acquisition of Coinart by the latter, however, Conn, at the direction of Macmillan, allegedly fell behind on its obligations under the Supply-Purchase Contract, to Coinart's financial detriment.

In June, 1971, plaintiff Richard Bosse, as president of Coinart, began negotiations with Valley National Bank [the Bank] for a loan to finance Coinart's operations. The Bank lent Coinart a total of approximately $325,000, and Coinart gave the Bank eight promissory notes for that amount, with due dates from November 17 to December 27, 1971 [VNB notes]. Plaintiffs personally guaranteed these loans and pledged to the Bank as security a majority of the Coinart stock. Despite these loans from the Bank, Coinart was unable to adequately finance its operations, and Macmillan then entered the scene.

On October 28, 1971, Macmillan and Coinart (again by Bosse, its president) entered into a written agreement, whereunder Macmillan agreed to lend Coinart up to $300,000 [Loan Agreement]. Macmillan also agreed to purchase from the Bank the $325,000 worth of VNB notes evidencing Coinart's prior indebtedness to the Bank, and to take by assignment the corresponding security (the controlling shares of Coinart stock).[1] Coinart was obligated to pay when due these VNB notes, the schedule for which was appended to the Loan Agreement. The agreement was to take effect upon Macmillan's purchase of these notes. From October, 1971 through January, 1972, Macmillan lent Coinart $270,000 and, pursuant to the Loan Agreement, Coinart gave Macmillan eight notes for that total amount, with due dates from January 24, 1972 to April 26, 1972 [Coinart notes].

On November 19, 1971, Macmillan formally purchased the VNB notes and also exacted from plaintiffs a letter agreement, wherein plaintiffs agreed that if Coinart defaulted on any of the VNB or Coinart notes, all of the notes would be accelerated and would become due and owing upon five days' written notice from Macmillan to Coinart [Acceleration Agreement]. Thereafter, Macmillan extended the time for pay-

1. To this end, on that same date of October 28, 1971, plaintiffs executed letter agreements addressed to Macmillan personally guaranteeing "when due" all of Coinart's obligations under the Loan Agreement and pledging to Macmillan, as collateral for Macmillan's purchase of the VNB notes and its direct loans to Coinart, all of the collateral previously pledged by plaintiffs to the Bank (including the majority shares in Coinart) on the terms and conditions set forth in the prior security agreement between Coinart and the Bank. These letter agreements referred to the Loan Agreement and indicated that they were made in consideration for the loans of up to $300,000 to be made by Macmillan to Coinart pursuant to the Loan Agreement, and the purchase by Macmillan of the $325,000 worth of VNB notes.

ment of the VNB notes to January 31, 1972, and the time for payment of the first two Coinart notes to April 22 and 25, 1972. On February 3, 1972, however, Macmillan gave Coinart notice that the latter was in default on the VNB notes and on one of the Coinart notes due February 2, 1972. The notice stated that pursuant to the Acceleration Agreement, all of the remaining notes would also become due and owing if the defaults were not cured within the 5-day grace period. On February 9, 1972, Macmillan demanded payment of all of the VNB and Coinart notes. On March 14, 1972, Macmillan gave plaintiffs written notice that their pledged Coinart stock would be sold by Macmillan at a foreclosure sale in New York on April 3, 1972. Plaintiffs, including Coinart, commenced this action on March 31, 1972 by filing their original 4-count complaint, which later was amended twice. On April 3, 1972, the foreclosure sale was held in New York and Macmillan bought plaintiffs' Coinart stock for $100. After thus obtaining record ownership of the Coinart stock, Macmillan filed on May 31, 1972, a notice of voluntary dismissal of Coinart from the case under Fed.R.Civ.P. 41(a), thereby removing Coinart as a party to this action.

After extensive discovery, plaintiffs filed a second amended complaint on July 18, 1973, alleging nine separate claims for relief. The district court granted Macmillan's motion to dismiss for failure to state a claim on five of plaintiffs' claims for relief, and granted summary judgment for Macmillan on two of plaintiffs' other claims for relief. The lower court directed entry of judgment under Fed.R.Civ.P. 54(b) as to its dismissal of these seven claims; the propriety of these dismissals is now before us.

█ Plaintiffs' first claim for relief in their complaint sought treble damages and divestiture for alleged violations of the federal and Arizona antitrust laws by Macmillan's impeding Coinart's negotiations with certain of Macmillan's competitors for the competitors' possible acquisition and financial rescue of Coinart. According to plaintiffs, Macmillan responded to these negotiations by directing its subsidiary Conn to breach the Supply-Purchase Contract between Conn and Coinart, thereby jeopardizing Coinart's financial position, and by exerting undue financial pressure on Coinart through strict enforcement of the Loan Agreement and Acceleration Agreement. These actions by Macmillan allegedly were taken for the purpose of ensuring its ability to gain control of Coinart. Plaintiffs thus claimed that Macmillan attempted to, conspired to, and did monopolize the woodwind instrument industry and unreasonably restrained trade in violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and specifically intended to lessen competition through its acquisition activities, in violation of section 7 of the Clayton Act (15 U.S.C. § 18). Violation of Arizona's antitrust laws also was alleged.[2] On Macmillan's motion, the district court dismissed this count of the complaint for failure to state a claim and for lack of subject matter jurisdiction. We find this disposition correct since plaintiffs lack standing to sue for these alleged antitrust violations.

This court repeatedly has used the "target area" approach[3] to antitrust standing under section 4 of the Clayton Act (15 U.S.C. § 15), requiring "identification of the affected area of the economy and then the ascertainment of whether the claimed injury occurred within that area."[4] *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.), *cert. denied sub nom., Morgan v. Automobile Mfrs. Ass'n, Inc.,* 414 U.S. 1045, 94 S.Ct. 551, 38

---

**2.** Ariz.Rev.Stat.Ann. Title 44, Ch. 10, art. 1.

**3.** *See generally* Lytle & Purdue, *Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation,* 25 Am.U.L.Rev. 795 (1976).

**4.** We agree with defendants that plaintiffs' reliance on *Harman v. Valley National Bank,* 339 F.2d 564 (9th Cir. 1964) is misplaced, since the opinion indicates that the plaintiff was active in the area of the economy allegedly affected by defendant's wrongful acts. In any event, in our cases subsequent to *Harman* we have consistently utilized the "target area" test.

L.Ed.2d 336 (1973); *see Blankenship v. Hearst Corp.,* 519 F.2d 418, 426 (9th Cir. 1975); *In re Western Liquid Asphalt Cases,* 487 F.2d 191, 199 (9th Cir. 1973), *cert. denied sub nom., Standard Oil Co. et al. v. Alaska et al.,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974). We have also recently noted that standing is a question of law for the court to determine and that it properly may be denied by pre-trial ruling where the plaintiff is not a "component of the competitive infrastructure" or a "component of competitive significance." *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 500 (9th Cir. 1977).[5] In our case, it is undisputed that although Coinart was (and presumably still is) in the musical instrument production business, plaintiffs as individuals are not now and have never been in that business aside from their roles as shareholders, officers and directors of Coinart. Thus, plaintiffs, who sue here solely in their individual capacities, are not within that area of the economy affected by defendants' alleged antitrust violations.

Plaintiffs, relying on *Schlick v. Castle,* CCH Fed.Sec.L.Rep. ¶ 94,909 (S.D.N.Y. 1974), concededly make an appealing equitable argument that former shareholders of a corporation which clearly is within the affected area of the economy should not be barred from suing for the very antitrust violation that allegedly was the means by which the defendant acquired the corporation. *Schlick* was later vacated, however,

by the authoring judge because Delaware, rather than Indiana, law was found to apply. More importantly, *Schlick* was a shareholders' derivative suit, in contrast to plaintiffs' present suit in their individual capacities. With no authority to buttress their position, plaintiffs cannot successfully establish antitrust standing here.[6]

■ Plaintiffs' claim for divestiture under section 16 of the Clayton Act (15 U.S.C. § 26) is also barred because of their lack of standing. After a thorough review of this section's legislative history, we held in *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913 (9th Cir. 1975) that divestiture is not an available remedy in private actions. *See also Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 692 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976).[7] Plaintiffs' attempt to distinguish *ITT* on the ground that it involved a separate competitor seeking divestiture, whereas this case concerns an attempted return to plaintiffs of stock previously owned by them, is unpersuasive. Therefore, plaintiffs' first claim was properly dismissed.

■ Plaintiffs' third claim for relief challenged the Arizona statutes authorizing the foreclosure sale as unconstitutional, depriving plaintiffs of their procedural due process right to a prior evidentiary hearing.

---

5. *John Lenore & Co., supra,* also recognized the Supreme Court's recent message that to recover for a violation of section 7 of the Clayton Act, a plaintiff must prove "antitrust" injury, that is, injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. *John Lenore & Co. supra* at 498–99, *citing Brunswick Corp. v. Pueblo Bowl-O-Matic, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). We believe granting standing to individuals who are not engaged in the affected area of the economy indeed would be inimical to the purposes underlying the antitrust laws.

6. We similarly are of the view that plaintiffs lack standing under Arizona's antitrust laws as well. Former Ariz.Rev.Stat.Ann. § 44–1405(B) (1956) conferred standing to "[a]ny person damaged by" any unlawful agreement, trust or combination. That statute was repealed effec-

tive August 9, 1974, while this case was pending in district court, and replaced by the corresponding provision found in *id.* § 44–1408(B) (Supp.1976–77) (part of the Uniform State Antitrust Act), which confers standing to any "person . . . injured in his business or property." In the absence of any guidance from the Arizona courts as to the scope of these slightly different standing provisions, we find standing lacking for the same reasons as under section 4 of the Clayton Act. *See id.* § 44–1412 (Supp.1976–77).

7. In *Brunswick Corp., supra* note 5, the district court had ordered divestiture in a private antitrust suit and the court of appeals outrightly rejected that portion of relief granted. Since the issue was not appealed to the Supreme Court, however, the Court did not address the issue. Thus, the *ITT* case remains the law of this circuit.

The district court correctly dismissed this count for failure to state a claim under 42 U.S.C. § 1983 because of the lack of sufficient "state action." Macmillan's foreclosure sale of the pledged Coinart stock was authorized by UCC §§ 9–503, 9–504, as adopted in Arizona. *Ariz.Rev.Stat.Ann.* §§ 44–3149 (1956), 44–3150 (Supp.1976–77). Plaintiffs claim that the Arizona legislature's enactment of these provisions in Arizona drastically altered Arizona law and thus constituted sufficient "state action" to activate the fourteenth amendment due process protections. This claim essentially has been addressed and rejected by our court in *Adams v. Southern California First National Bank*, 492 F.2d 324 (9th Cir. 1973), *cert. denied*, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974). We adopt the *Adams* analysis here to reject plaintiffs' argument.[8] The fact that Arizona's enactment of these provisions greatly changed Arizona law in this area rather than merely codifying a preexisting common law right does not establish "state action" for purposes of the fourteenth amendment without further indicia of governmental involvement. *See Melara v. Kennedy*, 541 F.2d 802, 805–06 (9th Cir. 1976); *Kenly v. Miracle Properties*, 412 F.Supp. 1072, 1075 (D.Ariz.1976) (3-judge court); *cf. Culbertson v. Leland*, 528 F.2d 426 (9th Cir. 1975). Plaintiffs' argument clearly cannot survive the multi-pronged analysis suggested in *Melara, supra* at 805, and thus dismissal of this count was proper.

Plaintiffs' fifth claim for relief sought damages for breach of contract by Macmillan in that it failed to abide by certain alleged agreements with plaintiffs and Coinart. Essentially, plaintiffs alleged that there were mutual oral understandings between Macmillan and plaintiffs which, while not memorialized in the actual written documents of October 28 and November 19, 1971, obligated Macmillan to defer re-

payment by Coinart of the Coinart and VNB notes until at least April, 1972. The thrust of these alleged oral understandings was that Macmillan, aware of Coinart's delicate financial situation, would help nurse it through its difficulties by "rolling over" the loan repayment due dates, that is to say, by renewing the notes as they fell due for successive 90-day periods, as the Bank supposedly had done before. In sum, a long-term financing arrangement assertedly was contemplated by the parties, and Macmillan breached this basic agreement when it strictly enforced the literal terms of the written documents by calling the notes after only a few short deferrals. The district court granted summary judgment for defendants on this count, finding the written contract between Macmillan, Coinart and plaintiffs complete and unambiguous and therefore refusing to allow introduction of parol evidence to alter or amend that contract. Plaintiffs' sixth claim for relief basically rested on the same allegations as the fifth, but instead sought reformation of the parties' written contract to conform to the oral understandings as set forth above. The district court granted summary judgment for defendants on this count as well, finding no mistake, fraud or deception in the contract or its underlying negotiations and therefore refusing to order reformation. Disposition of these two related claims in this manner was appropriate.

The October 28 Loan Agreement and November 19, 1971, Acceleration Agreement constituted a single, fully-integrated written contract between Macmillan, Coinart and plaintiffs. The district court's implicit finding to that effect precluded introduction of parol evidence to alter or modify the express terms of that contract. *See generally Brand v. Elledge*, 101 Ariz. 352, 419 P.2d 531 (1966); *Jamison*

---

**8.** *Adams* has similarly been followed in a majority of the other circuits. *See Bryant v. Jefferson Federal Savings & Loan Ass'n*, 166 U.S. App.D.C. 178, 509 F.2d 511 (1974); *Gary v. Darnell*, 505 F.2d 741 (6th Cir. 1974); *Gibbs v. Titelman*, 502 F.2d 1107 (3d Cir.), *cert. denied*, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316

(1974); *Nowlin v. Professional Auto Sales, Inc.*, 496 F.2d 16 (8th Cir.), *cert. denied*, 419 U.S. 1006, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); *James v. Pinnx*, 495 F.2d 206 (5th Cir. 1974); *Shirley v. State National Bank*, 493 F.2d 739 (2d Cir.), *cert. denied*, 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974).

*v. Southern States Life Ins. Co.*, 3 Ariz.App. 131, 412 P.2d 306 (1966). The parol evidence rule prohibits adding to, subtracting from, varying or contradicting the terms of a complete and unambiguous written contract through evidence of prior or contemporaneous agreements or negotiations. *Richards Development Co. v. Sligh*, 89 Ariz. 100, 101, 358 P.2d 329, 330 (1961). Plaintiffs argue that certain deposition statements by Macmillan officials and a written loan repayment schedule prepared by Macmillan personnel and submitted for consideration to Macmillan's board of directors indicate that a lenient "roll over" policy with respect to the VNB and Coinart notes was actually part of the overall contract between the parties, and that at a minimum the question of whether the October 28 and November 19 written documents were intended to constitute the "complete" contract was one of fact not properly disposable by summary judgment.[9] We cannot accept this argument. "When parties adopt a written form that gives every appearance of being complete and final, they are required to incorporate in that form their entire agreement. If they fail to do so, unincorporated terms relating to the same subject matter are void." Calamari & Perillo, *Contracts* § 41, at 82 (1970); *see* 4 *Williston on Contracts* §§ 638–39 (3d ed. 1961). Under Arizona law, the initial question of whether the written documents were intended to comprise the fully-integrated, complete agreement of the parties can be treated as one of law for the court.

*See Higgins v. Arizona Savings & Loan Ass'n*, 90 Ariz. 55, 61, 365 P.2d 476, 481 (1961); *Shore Line Properties, Inc. v. Deer-O-Paints & Chemicals, Ltd.*, 24 Ariz.App. 331, 334–35, 538 P.2d 760, 763–64 (1975). The district court here properly found the October 28 and November 19 written documents complete and unambiguous, and therefore rejection of parol evidence to modify the express terms of these writings was justified. The court was not required to look beyond those writings in determining that the parties intended them to constitute the entire contract between the parties.[10] *See Hofmann Co. v. Meisner*, 17 Ariz.App. 263, 265, 497 P.2d 83, 85 (1972), *citing Richards Development Co. v. Sligh, supra.* Summary judgment for defendants on the fifth claim therefore was appropriate. *See Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543–44 (9th Cir. 1975).

Plaintiffs' claim for reformation in their sixth claim can fare no better. They correctly note that the parol evidence rule is not totally applicable to actions for reformation, since parol evidence usually is necessary to establish the content of the parties' true agreement. *McNeil v. Attaway*, 87 Ariz. 103, 110, 348 P.2d 301, 305 (1959). Plaintiffs overlook one important point, however. Under Arizona law, an action for reformation, which is nothing more than an equitable remedy, will lie only if mistake, fraud or inequitable conduct infected the underlying negotiations, causing

9. Plaintiffs emphasize a written budget and cash flow projection of Coinart's operations which was prepared by Macmillan accountants and later approved and ratified by Macmillan's board of directors. This projection included a repayment schedule which indicated that repayment of interest on the loans was not anticipated until March, 1972, and the first payment of principal not expected until June, 1972. Plaintiffs argue that this projection schedule should have been considered as part of the written contract between the parties, thus escaping exclusion under the parol evidence rule. This data, however, appeared under the label "Tentative payment schedule" and, even if adopted by Macmillan, cannot be deemed part of the "agreement" between the parties. Simply put, the proposed repayment schedule was merely a document that Macmillan used in its internal decision-making process regarding its financial relationship with Coinart. The schedule was clearly at odds with the written documents of October 28 and November 19, which required Coinart to pay "when due" or "in accordance with their terms" the VNB and Coinart notes bearing maturity dates ranging from November 17, 1971 to April 26, 1972, and thus was properly excluded under the parol evidence rule.

Moreover, the deposition statements by Macmillan officials that plaintiffs rely upon are ambiguous and certainly do not indicate breach of contract.

10. Plaintiffs' other arguments for inapplicability of the parol evidence rule are unpersuasive.

the written document to deviate from the true intent of the parties. *See City of Scottsdale v. Burke,* 19 Ariz.App. 11, 504 P.2d 552 (1972).[11] Our case simply does not fit within this mold. While questions of fact often may render summary disposition of such claims as fraud and mistake inappropriate, *see State v. Ashton,* 4 Ariz.App. 599, 422 P.2d 727 (1967), the uncontroverted facts in this case reveal the absence of these elements. The record clearly shows that plaintiffs and their attorney examined each document at the time it was executed, discussed at length with Macmillan representatives those terms and conditions about which there were differences between the parties, and fully understood what was being signed. The parties dealt at arm's length and were represented by counsel throughout the negotiations, and had full knowledge of all facts surrounding the transaction. These facts warranted the district court's conclusion as a matter of law that mistake, fraud or inequitable conduct, the necessary prerequisites to reformation, were lacking. Under these circumstances, reformation was properly denied. *Nussbaumer v. Superior Court,* 107 Ariz. 504, 507–08, 489 P.2d 843, 846–47 (1971).

Plaintiffs' seventh claim for relief sought damages and rescission for alleged violations of the federal and state securities fraud laws in connection with the foreclosure sale of plaintiffs' Coinart stock on April 3, 1972, and the transactions leading thereto. The district court dismissed this count *inter alia* because subject matter jurisdiction was lacking; the applicable statute of limitations barred plaintiffs' claims under section 12(2) of the 1933 Securities Act (15 U.S.C. § 77*l*); plaintiffs' claim for rescission was barred by laches; and plaintiffs' remaining assertions were not stated with sufficient particularity under Fed.R. Civ.P. 9(b) and failed to state a claim under Fed.R.Civ.P. 12(b)(6). Several close questions are presented by these claims, and we reverse in part the district court's disposition of them.

▮ With respect to plaintiffs' allegations under sections 12(2) and 17 of the 1933 Act (15 U.S.C. §§ 77*l*, 77q), plaintiffs lack standing to sue under these sections for either damages or rescission since even under the most liberal view they cannot be considered either purchasers or offerees of securities. *Simmons v. Wolfson,* 428 F.2d 455, 456 (6th Cir. 1970), *cert. denied,* 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed.2d 450 (1971); *Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 788–91 (8th Cir. 1967); *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733–34, 736, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).[12] Thus, those prongs of plaintiffs' seventh claim were properly dismissed for lack of subject matter jurisdiction.[13]

11. The admissibility of parol evidence for reformation purposes may hinge on an initial finding of one of these elements. *See Apolito v. Johnson,* 3 Ariz.App. 358, 414 P.2d 442 (1966). Even if such evidence is admissible for this preliminary inquiry, however, the district court did not base its disposition of this sixth claim on the parol evidence rule, but rather on its determination as a matter of law that mistake, fraud or inequitable conduct was lacking.

12. The plaintiff class under section 12(2) of the Securities Act is expressly limited to "person[s] purchasing such security . . .", thus requiring an actual purchase by the plaintiff. In contrast, section 17 of that Act apparently may encompass not only actual purchasers but also offerees within the plaintiff class. See *Blue Chip Stamps v. Manor Drug Stores, supra* 421 U.S. at 733–34 & n. 6, 95 S.Ct. 1917. This, of course, assumes that an implied civil cause of action can be maintained under that section, an issue which the Supreme Court has not yet addressed. *Id.* at 734 n. 6, 95 S.Ct. 1917. In any event, plaintiffs do not qualify as either purchasers or offerees here.

13. The district court, as an alternative ground for dismissal of plaintiffs' claims under section 12(2) of the 1933 Act and Arizona's blue sky law (Ariz.Rev.Stat.Ann. tit. 44, ch. 12, arts. 13 & 14), held that these claims were barred by the applicable statutes of limitation. 15 U.S.C. § 77m; Ariz.Rev.Stat.Ann. § 44–2004(B). Plaintiffs waited for more than a year from their discovery of the alleged securities fraud before amending their complaint to add this claim. Since this was a totally new claim based on a transaction (the foreclosure sale of the Coinart stock) which had not even occurred at the time the original complaint was filed, the "relation back" doctrine under Fed.R.Civ.P. 15(c) would not aid plaintiffs here. *See Rural*

Plaintiffs also based their securities law claim in part on section 10(b) of the 1934 Securities Exchange Act (15 U.S.C. § 78j(b)) and rule 10b–5 thereunder (17 CFR § 240.-10b–5). The district court dismissed this portion of the claim for lack of subject matter jurisdiction, failure to allege the fraud with sufficient particularity under Fed.R.Civ.P. 9(b), and failure to state a claim under rule 12(b)(6). Dismissal of this portion of the seventh claim was erroneous.

▮▮▮ As this court stated in *Walling v. Beverly Enterprises*, 476 F.2d 393, 396 (9th Cir. 1973), if there is a "sale" of security and if fraud allegedly is used "in connection with" that sale, there is possible redress under section 10(b), regardless of whether a remedy is available under state law. The disposition of plaintiffs' pledged Coinart shares through the Macmillan foreclosure sale was a "sale" for purposes of this section and its accompanying rule, and plaintiffs thereby became "sellers" and thus satisfied the purchaser/seller requirement imposed by *Blue Chip Stamps, supra*. *See McClure v. First National Bank*, 497 F.2d 490, 495 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Lincoln National Bank v. Lampe*, 414 F.Supp. 1270, 1278 (N.D.Ill.1976); *Dopp v. Franklin National Bank*, 374 F.Supp. 904, 907–09 (S.D.N.Y.1974).[14] The "manipulative or deceptive device" alleged in this seventh claim was Macmillan's establishing a debtor-creditor relationship with plaintiffs *via* a loan and pledge arrangement, with the underlying intent or purpose of gaining control of Coinart. We cannot state at this preliminary stage that defendants' alleged failure to disclose their true intentions or motivations cannot legally constitute fraud within the jurisdictional scope of section 10(b). Nor can we conclude that the alleged fraud was not "in connection with" the foreclosure sale of the Coinart stock. *See Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *cf. Rochelle v. Marine Midland Grace Trust Co.*, 535 F.2d 523, 529 (9th Cir. 1976). Thus, plaintiffs' claim was at least within the compass of section 10(b) such that subject matter jurisdiction thereunder was sufficiently alleged.

▮▮▮ Macmillan argues that plaintiffs' assertions in this count were so vague and conclusory that they were properly dismissed under Fed.R.Civ.P. 9(b) for lack of particularity. Rule 9(b), however, only requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations. *Walling v. Beverly Enterprises, supra*. While mere conclusory allegations of fraud will not suffice, statements of the time, place and nature of the alleged fraudulent activities will. *Id.* Plaintiffs' seventh claim, though not a model of clarity, was sufficiently specific to withstand attack on rule 9(b) grounds.

▮▮▮ We next reach the question of whether plaintiffs' allegations in this count failed to state a claim for which relief could be granted under rule 12(b)(6). As stated above, plaintiffs' claim essentially is that Macmillan failed to disclose its underlying motivations and intentions when it assumed a creditor status over plaintiffs and received their pledged Coinart stock as collateral. Accepting plaintiffs' allegations as true and resolving all ambiguities in their favor, *Walling, supra* at 396, this portion of plaintiffs' seventh claim was barely sufficient to survive Macmillan's motions to dismiss. We believe that Macmillan's alleged undisclosed purpose of gaining control of Coinart, rather than of merely financing Coinart with a view toward helping it gain financial stability, gave rise to a possible claim for relief under section 10(b) and rule 10b–5.[15] In contrast to the facts of *Dopp v.*

*Fire Protection Co. v. Hepp*, 366 F.2d 355 (9th Cir. 1966).

**14.** At oral argument, defendants conceded that plaintiffs had standing as "sellers" for purposes

of section 10(b) and rule 10b–5 by reason of the foreclosure sale of their pledged Coinart stock.

**15.** The district court dismissed plaintiffs' request for rescission, which presumably was based at least in part on section 10(b), on the

*Franklin National Bank, supra* at 910 and *Molever v. Levenson,* 539 F.2d 996 (4th Cir.), *cert. denied,* 429 U.S. 1024, 97 S.Ct. 643, 50 L.Ed.2d 625 (1976), plaintiffs do allege that Macmillan was able to obtain control of Coinart for a nominal price. *See generally Cooper v. North Jersey Trust Co.,* 226 F.Supp. 972, 978 (S.D.N.Y.1964). While we express no view on the merits of this claim, we reverse that portion of the district court's order.[16]

Plaintiffs' eighth and ninth claims for relief were related and sought damages for breach of the Supply-Purchase Contract between Coinart and defendant Conn. Plaintiffs basically alleged that despite Coinart's compliance with that agreement, Conn, with the knowledge and on the instructions of Macmillan, delayed and discontinued payment on the saxophone invoices for instruments manufactured by Coinart and shipped to Conn under the agreement. Plaintiffs claimed that this behavior by Conn necessitated Coinart's entering into the Loan Agreement with Macmillan, in that the amount of the overdue invoices

was greater than that necessary to continue Coinart's operations. Plaintiffs further alleged (in the ninth claim) that Conn breached the Supply-Purchase Contract by not fulfilling its obligation thereunder to send adequate tooling inventory and parts to Coinart. These last two claims were dismissed by the district court for failure to state a claim in that plaintiffs were not the "real parties in interest" under Fed.R.Civ.P. 17(a).[17] This ruling by the district court was correct.

At the time this action was commenced Coinart was a named plaintiff. After Macmillan foreclosed on plaintiffs' pledged Coinart shares, however, Coinart voluntarily withdrew as a plaintiff pursuant to Fed.R.Civ.P. 41(a)(1). Plaintiffs' eighth and ninth claims were asserted only for the first time in plaintiffs' second amended complaint over one year after Coinart had withdrawn. In any event, these two claims are those of the corporation Coinart and not of the individual plaintiffs. Plaintiffs first contend that they were third party beneficiaries under the Supply-Pur-

ground that plaintiffs were barred by laches. There was a 15-month delay between plaintiffs' discovery of the alleged security fraud and the filing of the complaint. Two requirements for laches have been espoused by this court: lack of diligence by the party against whom the defense is asserted; and prejudice to the party asserting the defense. *Central Council v. Chucach Native Ass'n,* 502 F.2d 1323 (9th Cir. 1974); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir. 1970). Plaintiffs here clearly could have been more diligent in pressing their claim. Additionally, while defendants' assertions of prejudice are certainly not overwhelming, the record shows that Macmillan invested money and time into Coinart during the 15-month period, and this in our view substantiates the district court's finding of laches. *See Baumel v. Rosen,* 412 F.2d 571, 574–75 (4th Cir. 1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970). Therefore, plaintiffs' claim for rescission was properly dismissed.

**16.** While we have affirmed the summary judgment for Macmillan on plaintiffs' sixth claim for relief (for reformation), which rested in part on allegations of fraud, we do not feel our course taken on that count *ipso facto* disposes of plaintiffs' claim of securities fraud under section 10(b). Although Macmillan did not fraudulently misrepresent or suppress any of the terms or conditions of the agreements con-

summated by the parties, and did not leave uncorrected a misapprehension by plaintiffs as to the contract's terms, Macmillan had a potentially greater burden under section 10(b) to not mask its intentions with respect to plaintiffs' pledging of their Coinaet stock and Macmillan's subsequent foreclosure thereon. We are aware of no Arizona authority holding that a contracting party must explain his or her subjective motivation for entering into a validly executed contract, but such an explanation may be mandated by section 10(b) when the contracting party takes the other party's stock as collateral to secure the loan, with the undisclosed intention of gaining control of that stock. Even though the underlying negotiations and actual consummation of the contract here were not infected by fraud such that reformation under state law would lie, "fraud" for rule 10b–5 purposes is a more expansive concept that may encompass an intentional nondisclosure as that alleged here. At a minimum, it is a question that should not have been disposed of on the pleadings.

**17.** In contrast, plaintiffs themselves were parties to the Loan Agreement and Acceleration Agreement and thus were the "real parties in interest" with respect to their fifth and sixth claims for relief.

chase Contract and therefore are real parties in interest. This contention is without merit. Under Arizona law, "as a general rule only the parties and privies to a contract may enforce it." *Treadway v. Western Cotton Oil & Ginning Co.*, 40 Ariz. 125, 10 P.2d 371, 375 (1932). "[A] third person can recover on a contract to which he is not a party only if the contract reveals that the parties to the contract intended that the contract would directly benefit the third party or a class of which he is a member." *Johns-Manville Sales Corp. v. Reliance Ins. Co.*, 410 F.2d 277, 278 (9th Cir. 1969). "[I]t definitely must appear that the parties intend to recognize the third party as the primary party in interest and, as privy to the promise, in order for the third party to recover." *Irwin v. Murphey*, 81 Ariz. 148, 302 P.2d 534, 538 (1956). A simple reading of the Supply-Purchase Contract indicates that plaintiffs are not parties to that contract and are not intended to be direct beneficiaries of or primary parties in interest in that contract, and therefore are not third-party beneficiaries of that contract.

▮ Plaintiffs' other arguments are similarly unpersuasive. Plaintiffs' argument that Coinart's rule 41 dismissal was improper, since it was actually defendant Macmillan's acquisition of the controlling Coinart shares that brought about the dismissal, has no basis in the law. Plaintiffs also contend that Fed.R.Civ.P. 18(b) (joinder of remedies) permits them to join these claims with the other aspects of their case. Rule 18(b), however, does not contemplate the bringing of a contingent claim belonging to a non-party in the sense that plaintiffs desire. Plaintiffs' alternative argument that they have "direct ties and interests" in the Supply-Purchase Contract—namely, their status as guarantors and pledgors on Coinart's loans from Macmillan—which enable them to maintain the eighth and ninth claims, is not supported by their cases. Those cases involved claims by individuals alleging breaches of duties owed to them as individuals, and not, as here, to a non-party corporation. *See Empire Life Ins. Co. v. Valdak Corp.*, 468 F.2d 330 (5th Cir. 1972); *Buschmann v. Professional Men's Ass'n*, 405 F.2d 659 (7th Cir. 1969). Plaintiffs' eighth and ninth claims are not claims for breach of their guarantee and pledge agreements, but for breach of the Supply-Purchase Contract on which, as non-parties and non-beneficiaries, they cannot sue. Finally, relying on merger cases, plaintiffs contend that since the shareholders of the disappearing corporation were able to bring their claims non-derivatively for the disappearing corporation, plaintiffs likewise should be able to bring their claims for the corporation in this case. *See Miller v. Steinbach*, 268 F.Supp. 255 (S.D.N.Y. 1967); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir. 1974). This contention misses the point of those cases. In the merger situation, the disappearing corporation's shareholders still retained some interest, even though it was in the surviving corporation, and since the disappearing corporation no longer existed, such shareholders were the only ones who could bring an action to protect their interests in the disappearing corporation. Here, plaintiffs have not only lost their interest in Coinart, but Coinart still exists and either it or its present shareholders suing derivatively under Fed.R.Civ.P. 23.1 may seek recovery for any harm suffered by Coinart under the Supply-Purchase Contract. In conclusion, plaintiffs' eighth and ninth claims were properly dismissed under rule 17(a).

In accordance with the above, the district court's order is affirmed in its entirety except for that portion dismissing plaintiffs' claim for damages under section 10(b) of the 1934 Securities Exchange Act and rule 10b–5 thereunder.

CONTI, District Judge, dissenting:

I respectfully dissent to that portion of the majority's opinion which reverses the district court's order dismissing plaintiff's seventh claim for relief based on section 10(b) of the 1934 Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10(b)–5 thereunder (17 CFR § 240.10b–5). In all other respects, I concur with the majority.

As to the seventh claim for relief, the majority held that allegations of an undisclosed purpose of a secured party (Macmillan) to gain control of a debtor's company (Coinart) by having the debtor pledge its controlling shares of stock to the secured party as security for a loan while the debtor was in financial difficulty, rather than the secured party merely financing the debtor with a view toward helping the debtor gain financial stability, states a claim for relief under Rule 10(b)–5. Such allegations cannot and do not state a claim. If they did, every business transaction between sophisticated business persons involving stock as security, could give rise to a securities fraud claim when default by the debtor required foreclosure of the security. Under the majority's holding, a debtor need only make allegations of an undisclosed purpose and a secured party would be forced to trial since summary judgment would be an unlikely method for resolution of such allegations. As presented below, the record establishes that Macmillan's purpose was fully known by Coinart and, even if it was not, such an undisclosed purpose is not a material omission giving rise to a Rule 10(b)–5 violation.

To state a claim under Rule 10(b)–5, a plaintiff must plead and prove as an essential element that defendant made either an untrue statement of a material fact or omitted to state a material fact. 17 CFR § 240.10b–5(b); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In the instant case, we are faced with an alleged omission, that is, Macmillan's alleged failure to disclose its true purpose of take over when the pledge of stock was taken as security for the loan. However, the record in this case establishes that there was not an omission at all. To use the majority's own words:

"The record clearly shows that plaintiffs and their attorney examined each document at the time it was executed, discussed at length with Macmillan representatives those terms and conditions about which there were differences between the parties, and fully understood what was being signed. The parties dealt at arm's length and were represented by counsel throughout the negotiations, and had *full knowledge of all facts surrounding the transaction.*" p. 610. (Emphasis supplied)

This being so, it is clear that Coinart knew that if it did not make good on its obligations, Macmillan, in turn, would exercise its rights, foreclose on the security and take over control of Coinart. The purpose of the security was obvious.

Even if there was an omission on the part of Macmillan, it was not material. It is necessary "that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* 406 U.S. at 153–54, 92 S.Ct. at 1472. Here, we are not dealing with gullible, defenseless business people unable to protect themselves from the machinations of a vastly superior opposite party. Under these circumstances, this circuit has recognized that the duties under Rule 10(b)–5 are not as demanding as they might be in other situations. *Hughes v. Dempsey-Tegeler & Co., Inc.*, 534 F.2d 156, 177 (9th Cir. 1976). It does not make sense to hold Macmillan potentially liable for not disclosing a purpose which was obvious. Coinart knowingly agreed to post its controlling shares of stock as security for a loan. Coinart knew that Macmillan might very well foreclose on the security if Coinart failed to meet its obligations. So what if Macmillan's true purpose was to take over Coinart; Coinart's destiny was in its own hands and was determined by its own knowledgeable business decisions.

Furthermore, the cases cited by the majority support this dissent. *Dopp v. Franklin National Bank*, 374 F.Supp. 904 (S.D.N.Y.1974), held that an alleged conspiracy to shift voting power by selling pledged stock in violation of an alleged oral agreement while concealing the identity of the prospective purchaser from a party to the alleged oral agreement, did not state a claim for relief under Rule 10(b)–5. *Id.* at 909–10. *Molever v. Levenson*, 539 F.2d 996 (4th Cir. 1976), although not directly on point, is relevant since it deals with a pledge of stock in return for a loan. There, the

Fourth Circuit reversed a jury verdict in favor of plaintiff, as the alleged failure to disclose in that case did not amount to a violation of Rule 10(b)–5. *Id.* at 1000. *Cooper v. North Jersey Trust Co.,* 226 F.Supp. 972, 978 (S.D.N.Y.1964), by its broad language appears to support the majority's position; however, it is inapposite. That case dealt with the wrongful conversion of stock, not a failure to disclose in a pledge of stock situation.

I would affirm the district court in all respects.