**KONA ENTERPRISES, INC., individually and derivatively on behalf of Hanford's Inc. and Nationwide Industries, Inc., Plaintiffs,**

v.

**ESTATE OF Bernice Pauahi BISHOP by and through its trustees, Henry H. Peters, Myron B. Thompson, Oswald K. Stender, Richard S.H. Wong, and Matsuo Takabuki, William S. Richardson, Myron B. Thompson, and**

Henry H. Peters, individually; Hanford's, Inc.; Nationwide Industries, Inc.; Montrose Nationwide Limited Partnership; Snap Products; Inc.; Hanford's Creations; Inc., and John Does 1–10, Defendants.

No. Civ. 94–00858 DAE.

United States District Court, D. Hawaii.

May 21, 1998.

Russell S. Walker, Reid W. Lambert, Woodbury & Kesler, Salt Lake City, UT, James M. Sattler, Honolulu, HI, for Kona Enterprises, Inc., individually and derivatively on behalf of Hanford's, Inc., Nationwide Enterprises, Inc., plaintiff.

C. Michael Hare, David Schulmeister, and Kelly G. LaPorte, Honolulu, HI, for Estate of Bernice Pauahi Bishop, Matsuo Takabuki, William S. Richardson, Myron B. Thompson, Henry H. Peters, defendants.

Dennis W. Chong Kee, Cades Schutte Fleming & Wright, Honolulu, HI, for Hanfors's, Inc., Nationwide Enterprises, Inc., Snap Products, Inc., Hanford's Creations, Inc., defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

DAVID ALAN EZRA, District Judge.

The court heard Defendants' Motion on May 4, 1998. Russell S. Walker, Esq., appeared at the hearing on behalf of Plaintiffs; David Schulmeister, Esq., appeared at the hearing on behalf of Defendants. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS Defendants' Motion to Dismiss.

## BACKGROUND

The following facts are taken from the court's June 16, 1995, Amended Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. In July of 1988, Wayne Rogers ("Rogers") and his business associate, Clay Hamner ("Hamner") made a substantial investment in Kona Enterprises, Inc., and assumed control of the corporation. According to the Second Amended Complaint, on September 25, 1987, Montrose Hanford's Limited Partnership ("Montrose Hanford's") was formed. The managing general partners of Montrose Hanford's were WMR Development and Montrose Capital Associates. Limited partners in Montrose Hanford's included four trustees of the Bishop Estate: Matsuo Takabuki, William S. Richardson, Myron B. Thompson and Henry H. Peters ("Individual Defendants"). The purpose for the formation of Montrose Hanford's was to acquire control of Hanford's, Inc. ("Hanford's"), a company manufacturing specialty and seasonal decorations.

The Second Amended Complaint alleges that on July 5, 1988, Montrose Nationwide Limited Partnership ("Montrose Nationwide") was formed. The managing general partners of Montrose Nationwide were WMR Development and Montrose Capital Corporation. Limited partners included Tach One and Balanced Value as well as the Bishop Estate. The purpose for the formation of Montrose Nationwide was to acquire control of Nationwide, a company manufacturing products for the automotive aftermarket. After its formation in July of 1988, Montrose Nationwide invested $3.6 million in Nationwide, with $1.5 million being invested by the Bishop Estate, and, according to Plaintiffs, $1.0 million each from Tach One and Balanced Value.

Beginning shortly after July of 1988, Clay Hamner, a principal in Montrose Capital Associates and Montrose Capital Corporation, and Wayne Rogers, a principal in WMR Development, approached Montrose Hanford's and Montrose Nationwide about using Kona, an entity in which they had obtained a majority of the shares, as a vehicle to acquire Hanford's and Nationwide (collectively, the "Companies"). In approximately March of 1989, Kona acquired an interest in Hanford's by purchasing from Hanford's an $800,000 debenture.

Plaintiffs allege that on approximately December 20, 1989, the Bishop Estate acquired an interest in Kona by purchasing from Kona a $4.0 million 9 percent debenture. Shortly thereafter, the Individual Trustees and the Bishop Estate acquired shares in Kona, and Kona purchased all of the shares of Hanford's. In January of 1990, Takabuki, the senior trustee of the Bishop Estate, became a member of the board of directors of Kona.

In February of 1991, Kona acquired 100% of the stock of Nationwide. As a part of that transaction, the Bishop Estate and its Individual Trustees acquired additional shares in Kona. Beginning in February of 1991, Kona owned all of the shares in the Companies, and Kona's shareholders included Montrose Nationwide, Montrose Hanford's, the Bishop Estate, the trustees of the Bishop Estate, and the original shareholders of Kona, most of whom were individuals residing in Utah.

At the same time, the Companies were each obligated to BancBoston on separate commercial loans, referred to collectively herein as the "BancBoston Loans." Beginning in December of 1990, BancBoston expressed that it intended to call its loans to the Companies. BancBoston further demanded that certain over-advances made under the loan agreements needed to be secured by letters of credit and indicated that BancBoston would allow an "Interim Period" during which the Companies could seek alternative financing. On approximately February 12, 1991, the BancBoston Loans were restructured to extend the Interim Period. As part of the restructuring, the Bishop Estate agreed to provide letters of credit to BancBoston in the total amount of $6.5 million ($4.0 million to benefit Hanford's and $2.5 million to benefit Nationwide) as security for the

over-advance during the Interim Period. As consideration for the Bishop Estate's agreement to provide the letters of credit, the Bishop Estate received from Kona substantial fees and pledges of stock of the Companies. In addition, the Bishop Estate received from the Companies security interests in substantially all of the Companies' assets, and the assets of the Companies were cross-collateralized.

On February 27, 1991, representatives of the Plaintiffs met with representatives of the Bishop Estate to discuss the refinancing of the BancBoston Loans. Plaintiffs allege that, at this meeting, the Bishop Estate agreed that alternative financing should be found to replace the BancBoston Loans, and encouraged the representatives of the Plaintiffs to search for such alternative financing.

As an effort to again hold off a potential foreclosure, the Bishop Estate agreed to extend additional letters of credit, and BancBoston agreed to extend the Interim Period on the Hanford's Loan to April 19, 1991. In the Extension Agreement dated March 27, 1991, the Bishop Estate acknowledged that during the extended Interim Period, the Companies would seek and obtain long-term refinancing to replace the BancBoston Loans. The Bishop Estate received from Kona and the Companies substantial fees as consideration for the additional letters of credit.

Prior to April 12, 1991, representatives of the Plaintiffs arranged for BancBoston to extend the Hanford's Loan through December 31, 1991. That arrangement was reflected in a Restated Loan Agreement between Hanford's and BancBoston. Also prior to April 12, 1991, the Bishop Estate, through its representatives, allegedly directed Kona to withdraw its registration for a public offering to provide alternative financing to the BancBoston Loans.

In an agreement dated April 12, 1991, the Bishop Estate agreed to purchase the BancBoston Loans, upon the occurrence of certain conditions. As consideration for that agreement, the Bishop Estate received from Kona a substantial commit-ment fee, a warrant to acquire Kona stock, pledges of all of the outstanding common and preferred stock of both of the Companies, and an option to purchase most of the outstanding common stock of Kona.

The Second Amended Complaint alleges that between March of 1991, and July of 1991, representatives of the Plaintiffs approached at least 30 prospective lenders seeking alternative financing for the Companies. The representatives allegedly obtained favorable financial proposals to provide financing from Security Pacific Business Credit, Inc. ("SecPac") and Congress Financial Corporation, and obtained an offer from Allied Plastics to purchase Nationwide.

On June 25, 1991, representatives of the Plaintiffs presented the SecPac proposal to the Bishop Estate in a meeting held in Honolulu, Hawaii. That proposal allegedly provided funding on terms more advantageous than those contained in the BancBoston Loans. If accepted, the SecPac arrangement would allegedly have substantially reduced the financial exposure of the Bishop Estate, enhanced the terms of the financing and provided immediate relief to the Companies from the pressure of BancBoston's threatened foreclosure.

At the June 25, 1991 meeting, the Bishop Estate, through its senior trustee, Matsuo Takabuki, allegedly directed Kona to reject the SecPac proposal. Plaintiffs allege that Takabuki specifically stated to representatives of the Plaintiffs that the Bishop Estate was capable of securing replacement financing on terms better than those offered by the SecPac proposal and said that the Bishop Estate would do so.

The Second Amended Complaint alleges that, in reliance on Takabuki's representations, Kona rejected the SecPac proposal. On July 3, 1991, by unilateral decision the Bishop Estate purchased from BancBoston, by way of assignment, the Nationwide Term Note and Nationwide Revolving Note. Sometime in December 1991, the Bishop Estate purchased from BancBoston, by way of assignment, the Hanford's Term Note and the Hanford's Revolving

Note. Plaintiffs allege that following the June 25, 1991 meeting and its purchase of the BancBoston Loans, the Bishop Estate failed to seek alternative financing to·replace the BancBoston Loans. When contacted by representatives of the Plaintiffs regarding the efforts to locate replacement financing, the Bishop Estate and its trustees allegedly refused to provide information to the Plaintiffs and refused to discuss the potential of locating new financing.

By February 19, 1992, the Bishop Estate had not provided alternative financing for the Companies to replace the BancBoston Loans, which were now owned by the Bishop Estate. On February 19, 1992, the Bishop Estate made demands on Kona in a letter stating its intention to gain immediate control of the Companies. On April 3, 1992, Defendants served a demand upon the Companies to immediately pay or cause to be paid to the Bishop Estate the amounts allegedly owing under the notes to Nationwide and Hanford's.

The Second Amended Complaint further alleges that during the period from approximately February to May 1992, representatives of the Bishop Estate contacted a number of trade creditors and·suppliers of Nationwide. In these contacts, representatives of the Bishop Estate allegedly made highly derogatory and harmful comments about Nationwide's financial condition and management. According to Plaintiffs, these comments adversely affected Nationwide's business.

Plaintiffs contend that during the period from approximately February to May 1992, the Bishop Estate exercised control over the cash flow of the Companies by placing the deposits from each of the Companies into a sweep account. . Representatives of the Bishop Estate allegedly refused to allow the Companies sufficient operating capital to maintain the Companies at a reasonable business level but periodically controlled the sweep account and removed funds which the Companies required for their day-to-day operations.

In addition, the Second Amended Complaint states that, on approximately June 4, 1992, having given Kona less than one week notice, the Bishop Estate foreclosed upon the stock of Hanford's and Nationwide under the stock pledge agreement, taking the only valuable assets of Kona: its shares in the companies. On approximately September 13 and 15, the Bishop Estate foreclosed the BancBoston Loans, taking all of the assets of the Companies.

In Count 1, the Second Amended Complaint asserts claims for breach of fiduciary duties owed Plaintiffs, based upon the following conduct by Defendants: (1) vetoing the SecPac proposal to replace the BancBoston Loans; (2) representing that Defendants could obtain alternative financing to the BancBoston Loans and failing to make reasonable efforts to do so; (3) terminating efforts to obtain alternative financing through a public offering; (4) extracting from Kona substantial fees and interest in excess of the value provided to the Companies in connection with the various extensions of the BancBoston Loans; (5) breaching the Extension Agreement; (6) interfering with the corporate governance of Kona and the Companies by impairing their ability to operate and by denigrating their business; (7) failure to communicate their intended actions regarding financing; and (8) wrongfully foreclosing on the stock pledges made to secure Defendants' credit. Plaintiffs claim $3,615,500.00 in damages for this count.

In their second claim for relief, Plaintiffs assert that the same conduct resulted in the breach of the covenant of good faith and fair dealing. The third claim for relief alleges interference with corporate opportunity and economic advantage based upon this conduct. The fourth claim asserts interference with corporate governance. The fifth claim requests that a constructive trust be imposed on the assets· and stock of the Companies for the benefit of Plaintiffs. Finally, the· sixth claim for relief seeks punitive damages.

## DISCUSSION

On .April 6, 1998, Defendants filed a second supplemental memorandum in sup-

port of their prior motion to dismiss. In this memorandum, Defendants argue that Plaintiff Kona Enterprises, Inc. ("Kona") lacks standing to pursue derivative claims on behalf of Hanford's Inc. and Nationwide Industries, Inc. ("the Companies"). Specifically, Defendants assert that because Kona did not own stock in the Companies at the time it filed this lawsuit, Kona does not have standing to assert a derivative claim on behalf of the Companies.

The issue presented by Defendants' motion is a difficult one. "Fed.R.Civ.P. 23.1 requires that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts and that the plaintiff retain ownership of the stock for the duration of the lawsuit." *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir.1983); *Guenther v. Pacific Telecom, Inc.*, 123 F.R.D. 341 348 (D.Or.1987). However, state law does not always impose a continuous ownership requirement. For example, North Carolina, the state where Kona is currently incorporated, only requires that the plaintiff in a derivative suit prove that he was a shareholder at the time of the alleged wrongdoing. *See* N.C.Gen.Stat. § 55–7–41 (1997).[1] There is no requirement that the plaintiff own stock at the time the lawsuit is filed, or that the stockholder maintain his stock ownership through the duration of the lawsuit. *See Alford*, 398 S.E.2d at 449 ("[T]here is no requirement ... that a shareholder bringing suit remain a share owner 'after' the time of the transaction complained about or 'after' suit was filed.") Consequently, there is a conflict between Rule 23.1 and the standing requirements of some states.

Under the *Erie* doctrine, federal courts sitting in diversity must apply state law to substantive issues; however, federal law governs procedural matters. *Erie*

*Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Ninth Circuit has concluded that "the characterization of an action as derivative or direct is a question of state law." *Sax v. World Wide Press, Inc.*, 809 F.2d 610, 613 (9th Cir.1987) (citations omitted). However, "[i]n federal courts, derivative suits are subject to the procedural requirements of Fed.R.Civ.P. 23.1. Rule 23.1 governs derivative actions 'to enforce a right of a corporation when the corporation itself failed to enforce a right which may properly be asserted by it in court.'" *Id.* (citations omitted). Thus, once the court has characterized an action as direct or derivative, federal law determines whether the plaintiff has standing to maintain the lawsuit.

In this case, the court has already determined that, under state law, Kona must assert its claims derivatively on behalf of the Companies. *See* Amended Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, filed June 16, 1995. Now, the court must determine whether Kona has standing to assert these claims under Rule 23.1. As indicated above, Rule 23.1 "requires that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts and that the plaintiff retain ownership of the stock for the duration of the lawsuit." *Lewis*, 719 F.2d at 1047. Kona did not own stock in the Companies at the time it filed this lawsuit on November 9, 1994. Kona's shares in the Companies were foreclosed on June 4, 1992, pursuant to a stock pledge agreement. Therefore, under Rule 23.1, Kona does not have standing to assert derivative claims on behalf of the Companies. *See Eagle v. American Telephone and Telegraph Company*, 769 F.2d 541, 546 (9th Cir.1985); *Bosse v. Crowell Collier and Macmillan*, 565 F.2d 602, 612–13 (9th Cir.1977); *Watson v. Button*, 235 F.2d 235, 236–37 (9th Cir.1956).

---

1. This is the current version of the North Carolina statute which was in effect as of October 1, 1995. However, the precursor to this statute, which was in effect at the time Plaintiffs filed their North Carolina lawsuit, also did not contain a continuing share ownership requirement. *See* N.C.Gen.Stat. § 55–7–40 (1990); *Alford v. Shaw*, 327 N.C. 526, 398 S.E.2d 445, 449 n. 3 (1990).

Kona argues, however, that the court should fashion an equitable exception to the standing requirements of Rule 23.1 where the loss of plaintiff's shareholder status is allegedly due to the wrongful conduct of the Defendants, and the complained of wrongful conduct forms the basis of plaintiff's derivative claims. In support of this argument, Kona cites cases in which courts have created an equitable exception to Rule 23.1 where the plaintiffs lost their shares in the corporation as a result of the alleged misconduct of the Defendants. *See, e.g., Keyser v. Commonwealth Nat'l Financial Corp.*, 120 F.R.D. 489 (M.D.Pa.1988); *Eastwood v. Nat'l Bank of Commerce, Altus, Oklahoma,* 673 F.Supp. 1068 (W.D.Okla.1987); *Arnett v. Gerber Scientific, Inc.*, 566 F.Supp. 1270 (S.D.N.Y.1983); *Miller v. Steinbach,* 268 F.Supp. 255 (S.D.N.Y.1967). However, these cases do not squarely suggest that, under the facts of *this* case, Kona has standing to sue derivatively on behalf of the Companies or that an equitable exception to requirements of Rule 23.1 is warranted.

For example, in the *Eastwood* case, plaintiffs were the corporation itself, and a former shareholder of the corporation, who were suing a bank that had taken stock pledges in the corporation in exchange for three loans made to the corporation. *Eastwood,* 673 F.Supp. at 1070. The bank ultimately foreclosed on the stock collateral after the corporation failed to make the monthly loan payments. The plaintiffs brought suit against the bank alleging causes of action for fraud, conversion, slander, interference with contract, breach of contract, and violations of Rule 10b–5 of the Securities and Exchange Act. The defendants filed a motion to dismiss arguing, in part, that Plaintiff Babe Eastwood lacked standing to sue derivatively on behalf of the corporation because he was no longer a shareholder of the corporation. The court rejected the defendants' argument, explaining that the plaintiff had standing, as an "equitable shareholder," to sue derivatively on behalf of the corporation. *Id.* at 1077. The court explained that where the plaintiff's claim is properly viewed as being contingent upon plaintiff's ultimate success in setting aside or rescinding the sale of stock, the plaintiff "has an adequate interest in vigorously litigating the corporate claim." *Id.* The court therefore denied defendants' motion to dismiss for lack of standing.

Although the court understands the rationale behind the *Eastwood* decision, the claims presented by the plaintiffs in the *Eastwood* case differ significantly from those presented by Kona in this case. The primary distinction, of course, is the fact that in this case, Kona is *not* attempting to recover its stock in the Companies. This is Kona's third lawsuit against the Defendants, and its ninth filed complaint. However, at no point in the history of this litigation has Kona sought recovery of its shares in the Companies.[2] Instead, Kona has sought to recover its investment of the Companies, free of any debts which the Companies owe to their creditors. Looking at its prayer for relief, there is no indication that Kona is seeking a return of its shares in the Companies. Further, in its complaint, Kona has failed to assert any basis for the recission of the stock pledge agreement.[3] Thus, even if Kona was ulti-

---

**2.** The court notes that in its Second Amended Complaint, Kona has asserted a claim against the Defendants for a constructive trust. In this claim, Kona maintains that a constructive trust should be imposed on the assets and stock of the Companies for the benefit of Kona. However, a constructive trust is not a claim, in and of itself, rather it is a remedy which may be sought by a plaintiff after he or she has established that certain prerequisites have been met. Nevertheless, even in its constructive trust claim, Kona does not seek rescission of the stock pledge agreement.

**3.** In their Second Amended Complaint, Plaintiffs do not allege any wrongful conduct by the Defendants in connection with the formation and execution of the stock pledge agreement. There is no allegation that Plaintiffs were fraudulently induced to enter into the stock pledge agreement, or that in executing the stock pledge agreement, Defendants violated any fiduciary duty owed to the Plaintiffs.

mately to obtain all of the relief it seeks in its complaint, it would not recover its stock in the Companies. Accordingly, the *Eastwood* case does not suggest that the court should create an equitable exception to Rule 23.1 under the facts of this case.[4]

Plaintiffs also rely on the *Keyser* and *Miller* decisions in support of their contention that they have standing, as former shareholders, to assert a derivative claim on behalf of the Companies. However, both of these cases involved mergers wherein the plaintiffs were attempting to assert claims on behalf of a corporation which was dissolved following a merger. In *Bosse v. Crowell Collier and Macmillan*, 565 F.2d 602, 613 (1977), the Ninth Circuit distinguished merger cases from the situation where a shareholder loses his stock in a corporation, and then attempts to sue as a former shareholder of the corporation.[5] The plaintiffs in *Bosse* were former officers, directors and controlling shareholders of a musical instrument manufacturer, Coinart Corporation ("Coinart"). In June of 1971, Coinart obtained a loan from a bank in order to finance its manufacturing operations. The bank lent Coinart $325,000, and in return, Coinart gave

Instead, Plaintiffs allege that Defendants wrongfully foreclosed upon Kona's stock in the Companies pursuant to the stock pledge agreement. However, this allegation does not suggest that the stock pledge agreement itself is subject to rescission.

Further, any attempt by Kona to assert such a claim at this stage of the litigation would be untimely, and thus barred by the doctrine of laches. *See Bosse*, 565 F.2d at 612 n. 15. The stock pledge agreement was entered into in 1991 and Kona's stock in the Companies was foreclosed upon by Defendants in 1992. Thus, any attempt by Kona to assert such a claim at this stage of the litigation would be unreasonable and certainly prejudicial to the Defendants, especially in light of the fact that the Plaintiffs have offered no explanation for their failure to assert a claim for rescission either in this lawsuit, or any of the previous lawsuits filed by Plaintiffs. It is also important to note that Plaintiffs had an opportunity to assert a rescission claim in the North Carolina lawsuit which was filed in 1992, before Defendants foreclosed upon Kona's stock in the Companies.

the bank eight promissory notes. Plaintiffs personally guaranteed the notes and pledged a majority of Coinart's stock as security.

Despite the loan from the bank, Coinart had difficulty financing its operations. In October of 1971, Coinart and Defendant Crowell Collier and Macmillan ("Macmillan") "entered into a written agreement, whereunder Macmillan agreed to lend Coinart up to $300,000 (Loan Agreement). Macmillan also agreed to purchase from the Bank the $325,000 worth of VNB notes evidencing Coinart's prior indebtedness to the Bank, and to take by assignment the corresponding security (the controlling shares of Coinart stock). Coinart was obligated to pay when due these VNB notes, the schedule for which was appended to the Loan Agreement.... On February 9, 1972, Macmillan demanded payment of all of the VNB and Coinart notes. On March 14, 1972, Macmillan gave plaintiffs written notice that their pledged Coinart stock would be sold by Macmillan at a foreclosure sale in New York on April 3, 1972." *Id.* at 606.

4.  Similarly, the *Arnett* decision is distinguishable from the facts presented in this case as the plaintiffs in the *Arnett* case were seeking a rescission of a merger which would have resulted in a return of their shareholder status. The court's conclusion that the plaintiffs in *Arnett* had standing to sue derivatively on behalf of the corporation was based on the fact that any money recovered from the defendants would go directly to the corporation. In this case, Kona's claims are pled derivatively. However, Kona has continued to insist that its damages should be measured by its investment in the Companies, rather than the harm allegedly suffered by the Companies.

5.  The court notes for the record that in the *Bosse* case, the plaintiffs were not attempting to sue derivatively on behalf of the corporation. However, this case is nevertheless instructive on the issues presented by the facts of this case as the plaintiffs in *Bosse* were former shareholders, officers and directors of a corporation who were attempting to assert a cause of action which the Ninth Circuit concluded belonged to the corporation.

On March 31, 1972, Plaintiffs, including Coinart, filed a lawsuit against Macmillan. "On April 3, 1972, the foreclosure sale was held in New York, and·Macmillan bought plaintiffs' Coinart stock for $100. After thus obtaining record ownership of the Coinart stock, Macmillan filed on May 31, 1972, a notice of voluntary dismissal of Coinart from the case under Fed.R.Civ.P. 41(a), thereby removing Coinart as a party to this action." *Id.* "The district court [then] granted Macmillan's motion to dismiss for failure to state a claim on five of plaintiffs' claims for relief, and granted summary judgment for Macmillan on two of plaintiffs' other claims for relief." Plaintiffs appealed the district court's decision to the Ninth Circuit Court of Appeals.

On appeal, Plaintiffs argued that "Coinart's rule 41 dismissal was improper, since it was actually defendant Macmillan's acquisition of the controlling Coinart shares that brought about the dismissal." *Id.* The Ninth Circuit rejected this argument, explaining that it had no basis in the law. *Id.* Plaintiffs alternatively asserted that they should have standing to sue on behalf of Coinart, despite the fact that they were no longer shareholders in the company. In making this argument, Plaintiffs compared themselves to the shareholders of a corporation which is dissolved following a merger. *See Miller*, 268 F.Supp. 255; *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.1974).

In rejecting this argument, the Ninth Circuit explained that "[t]his contention misses the point of [the merger] cases. In the merger situation, the disappearing corporation's shareholders still retained some interest, even though it was in the surviving corporation, and since the disappearing corporation no longer existed, such shareholders were the only ones who could bring an action to protect their interests in the disappearing corporation. Here, plaintiffs have not only lost their interest in Coinart, but Coinart still exists and either it or its present shareholders suing derivatively under Fed.R.Civ.P. 23.1 may seek recovery for any harm suffered by Coinart under the Supply–Purchase Contract."

*Bosse*, 565 F.2d at 613. The Ninth Circuit therefore affirmed the district court's conclusion that the plaintiffs did not have standing to assert derivative claims on behalf of Coinart.

The facts of the *Bosse* case are similar to the situation presented in this case. As of February 1991, Kona was the sole shareholder of the Companies, and its shares in the Companies were Kona's only assets. Plaintiffs' Second Amended Complaint, ¶ 32. During that same period of time, the Companies were each indebted to BancBoston on separate commercial loans. *Id.* at ¶ 34. In December of 1990, BancBoston informed the Companies that it intended to call its loans, and that some of the over-advances made to the Companies had to be secured by letters of credit. The Bishop Estate provided letters of credit to BancBoston totaling $6,500,-000.00. As consideration for the letters of credit, the Bishop Estate received from Kona substantial fees and pledges of stock in the Companies. The Bishop Estate also received security interests in virtually all of the Companies' assets. *Id.* at ¶¶ 38, 39.

On April 21, 1991, Bishop Estate agreed to purchase the BancBoston Loans in exchange for a "substantial commitment fee, a warrant to acquire Kona stock, pledges of all of the outstanding common and preferred stock of both of the Companies, and an option to purchase 91.34 percent of the outstanding common stock of Kona." *Id.* at ¶ 45. On April 3, 1992, the Bishop Estate served a demand on the Companies to immediately pay all amounts currently outstanding on the notes. On June 4, 1992, the Bishop Estate foreclosed upon Kona's stock in the Companies pursuant to the stock pledge agreement. *Id.* at ¶ 63. On September 13th and 15th, 1993, the Bishop Estate, acting through Snap Products, Inc. and Hanford's Creations, Inc., foreclosed on the BancBoston loans, taking all of the assets of the Companies. *Id.* at ¶ 65.

It is apparent from the allegations contained in Plaintiffs' Second Amended Complaint that when Plaintiffs filed their law-

suit in Hawaii on November 9, 1994, Kona was no longer a shareholder in the Companies. Although Kona asserts that it lost its shares in the Companies as a result of Bishop Estate's wrongful foreclosure of the stock pledge agreement, this does not excuse Plaintiffs' failure to comply with the procedural requirements of Rule 23.1. As the court explained in *Bosse*, the situation presented by the facts of this case is not analogous to the situation where a corporation is dissolved following a merger of the corporation with another entity. In this case, the Companies still exist. Therefore, as the *Bosse* court noted, the Companies have the right to file their own lawsuit against the Bishop Estate and the other named Defendants. Alternatively, suit could be brought by the current shareholders of the Companies.[6] The Companies are not, therefore, without a remedy.

Significantly, even if the technical requirements for an equitable exception to Rule 23.1's standing requirements were met in this case, the court would conclude that, in light of the unusual procedural history of this case, it would be inappropriate to apply it here. Plaintiffs originally filed this lawsuit in North Carolina in 1992. At that time, Kona still owned shares in the Companies, and thus Plaintiffs clearly had standing to maintain a derivative suit on behalf of the Companies. However, on May 25, 1993, Plaintiffs voluntarily dismissed their North Carolina lawsuit and, just two days later, refiled a separate lawsuit in Utah.[7] Although Plaintiffs fail to provide any explanation in the record for their voluntary dismissal of the North Carolina lawsuit, the fact that Plaintiffs voluntarily dismissed a lawsuit in which they had standing to assert derivative claims on behalf of the Companies militates against any concern this court might otherwise have had for the fact that Plaintiffs' cur-

rent lawsuit must be dismissed for lack of standing.

Accordingly, the court finds that in light of the procedural history of this case, and the fact that Plaintiffs did have an available remedy within their grasp in state court, it would be inappropriate for the court to create an equitable exception to Rule 23.1's requirement that a plaintiff seeking to assert a derivative claim on behalf of a corporation must own shares in the corporation at the time it files its lawsuit. Therefore, because Kona did not own any shares in the Companies at the time it filed this lawsuit, Kona does not have standing to assert derivative claims on behalf of the Companies and the court GRANTS Defendants' Motion to Dismiss.[8]

## CONCLUSION

For the reasons stated above, the court GRANTS Defendants' Motion to Dismiss.

IT IS SO ORDERED.

---

6. Of course, this option is unlikely in light of the fact that the Bishop Estate is still in control of the Companies.

7. On April 1, 1994, the district court in Utah granted the Defendants' motion to dismiss for improper venue.

8. As the court has found that Kona does not have standing to assert any claims against the Defendants, the court need not address the remaining arguments raised by Defendants in their motion to dismiss.